T.C. Memo. 2015-150

UNITED STATES TAX COURT

VINCENTE OCAMPO JUNIOR a.k.a. VINCENTE OCAMPO AND ILLIANET
PADILLA a.k.a. ILIANET OCAMPO, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 20224-13.                    Filed August 11, 2015.

In 2008 and 2009 P-H operated a landscaping business as a sole
proprietorship. Ps reported gross receipts from and claimed
deductions for expenses incurred by the landscaping business on their
2008 and 2009 joint Federal income tax returns. Ps filed those tax
returns untimely, and R audited them. On the basis of a bank deposits
analysis R determined that Ps had received but failed to report
additional business income and other income. R also disallowed for
lack of substantiation many of Ps' claimed business expense
deductions, including portions of their deductions for car and truck,
interest, and other expenses. R determined for each tax year a
deficiency in income tax, an I.R.C. sec. 6651(a)(1) addition to tax,
and an I.R.C. sec. 6662(a) accuracy-related penalty.

Held: Ps established by a preponderance of the evidence that
some of the unreported deposits consisted of nontaxable transfers and
loan proceeds, and that some of the alleged unreported income R
determined resulted from computational errors in the bank deposits

[*2] analysis.  Ps failed to establish that the balance of the determined unreported income was nontaxable or resulted from computational errors.

   Held, further, with the exception of depreciation allowable for two vehicles used in P-H's business, Ps failed to adequately substantiate car and truck expenses in excess of the amounts R has already allowed.  Ps further failed to adequately substantiate interest or other business expenses in excess of the amounts R has already allowed.

   Held, further, Ps are liable for the I.R.C. sec. 6662(a) accuracy-related penalty for the 2008 tax year.


Vincente Ocampo Junior a.k.a. Vincente Ocampo and Illianet Padilla a.k.a.

Ilianet Ocampo, pro sese.

Michael K. Park and Casinova Henderson, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, Judge:  For petitioners' 2008 and 2009 taxable years respondent determined deficiencies in income tax, section 6651(a)(1) additions to tax, and section 6662(a) accuracy-related penalties as follows:[1]

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986 (Code), as amended and in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all amounts to the nearest dollar.

[*3]

| Year | Deficiency | Addition to tax sec. 6651(a)(1) | Penalty sec. 6662(a) |
|------|------------|--------------------------------|----------------------|
| 2008 | $35,100 | $9,777 | $7,020 |
| 2009 | 48,344 | 12,086 | 9,669 |

After the filing of a first stipulation of facts and a stipulation of settled issues,[2] the facts of which are agreed to by the parties and incorporated herein by this reference, the issues remaining for decision are:

---

[2]In the stipulation of settled issues: (1) petitioners conceded that they are not entitled to deduct the $971 of gift/incentives expense claimed on Schedule C, Profit or Loss From Business, of their jointly filed 2008 Form 1040, U.S. Individual Income Tax Return; (2) respondent conceded that petitioners are entitled to deduct on Schedule C $1,842 of check cashing fees for 2008; (3) respondent conceded that for 2009 petitioners are entitled to deduct on Schedule C other expenses of $4,763 in addition to the $18,783 respondent allowed on audit, for a total allowed deduction of $23,546; (4) petitioners conceded that they are not entitled to the $11,753 net operating loss carryforward claimed on their 2008 Form 1040; (5) respondent conceded that for 2008 petitioners are entitled to cost of goods sold of $202,666, which is the amount claimed on their 2008 Schedule C; (6) respondent conceded that for 2009 petitioners are entitled to cost of goods sold of $156,133, which exceeds by $13,502 the amount reported on their 2009 Schedule C; (7) petitioners conceded that for 2009 they erroneously reported on Schedule E, Supplemental Income and Loss, a $33,321 net loss; (8) respondent conceded that for 2009 petitioners do not have qualified dividend income of $19,100; (9) petitioners conceded that they are liable for the sec. 6651(a)(1) additions to tax for failure to timely file their Federal income tax returns for 2008 and 2009; and (10) petitioners conceded that they are liable for the sec. 6662(a) accuracy-related penalty for 2009. To the extent these stipulated concessions fully resolve previously disputed issues, we will not further address them.

**[*4]** (1) whether for each tax year at issue petitioners received but failed to report additional gross receipts from Mr. Ocampo's landscaping business (Ocampo's Landscaping) and other income;

(2) whether for each tax year at issue petitioners are entitled to deduct other expenses of Ocampo's Landscaping in excess of the amounts respondent has already allowed;

(3) whether for each tax year at issue petitioners are entitled to deduct car and truck expenses in excess of the amounts respondent has already allowed; and

(4) whether for 2008 petitioners are liable for the section 6662(a) accuracy-related penalty.

## FINDINGS OF FACT

During 2008 and 2009 Vincente Ocampo Junior, also known as Vincente Ocampo, owned and operated a gardening and landscaping business as a sole proprietorship. Petitioners' joint 2008 and 2009 Federal income tax returns identify the business as Ocampo's Landscaping and report its address as petitioners' home address. Mr. Ocampo's wife, Illianet Padilla, also known as Ilianet Ocampo,[3] was employed as an x-ray technician by the University of

---

[3]For clarity, the Court will refer to her as "Ms. Padilla" throughout this opinion.

[*5] California, Los Angeles (UCLA), during 2008 and 2009. Mr. Ocampo and Ms. Padilla lived in California when they filed their petition.

I.  Ocampo's Landscaping

During 2008 and 2009 Ocampo's Landscaping performed high-end landscaping work and also provided regular landscaping maintenance for some of its clients. Ocampo's Landscaping's projects often involved masonry, such as for fire pits, as well as the installation of outdoor lighting and speakers and built-in barbeque grills. Approximately 85%-90% of its business consisted of large projects at high-end homes. Its aggregate fees for these projects ranged from about $20,000 to $200,000. Its clients typically paid by check, not in cash.

On June 10, 2008, Mr. Ocampo established a business checking account for Ocampo's Landscaping at Washington Mutual Bank, which was later acquired by Chase Bank (WAMU account). Both before he established that account and afterward, Mr. Ocampo sometimes cashed at Sanchez Meat Market (Market) checks he received from clients as payment for landscaping services.

The years at issue were a financially difficult period for Ocampo's Landscaping. Because the WAMU account balance was often low, the bank would sometimes wait seven or eight days before making the funds from a deposited check available. Mr. Ocampo viewed the Market as a "quick bank"

**[*6]** from which he could, in exchange for a fee, obtain the funds from a check immediately rather than depositing the check into the WAMU account and waiting. After cashing a check at the Market, Mr. Ocampo would use the cash to purchase materials, to pay workers who helped him, and/or to pay himself, by depositing some of the cash into his and Ms. Padilla's joint checking account at University Credit Union (UCU account). After establishing the WAMU account Mr. Ocampo regularly wrote checks to his wife from that account, and she deposited them into the UCU account to be used for petitioners' personal expenses.

At a time not established in the record, Mr. Ocampo performed landscaping services for Ms. Padilla's brother, Hector Padilla, at a single-family home on Flicker Way in Los Angeles that Mr. Padilla had purchased in November 2005 with the initial intention of redeveloping and then reselling it. Messrs. Ocampo and Padilla did not enter into a written agreement at the outset. Instead, Mr. Ocampo simply began doing work, and his final bill to Mr. Padilla for labor and materials was $152,000. Mr. Padilla was unable to sell the property and, in his words, "ran into money problems"; he temporarily moved into the house but by the time of trial was renting it out and living elsewhere. Although Mr. Padilla signed a promissory note obliging himself to make monthly payments of principal and interest to

[*7] Mr. Ocampo for his work, he had made no payments as of the date of trial, December 3, 2014.

II.    Home Mortgages

During 2008 and 2009 petitioners owned their primary residence subject to three mortgages. As reported to them on Forms 1098, Mortgage Interest Statement, they paid mortgage interest on those loans to the following mortgage servicers in the following amounts:

| | Account No. 6595 | | Account No. 3826 | | Account No. 7716 | | Total |
|---|---|---|---|---|---|---|---|
| Year | Payee | Amount | Payee | Amount | Payee | Amount | |
| 2008 | Nat'l City Mortg. | $8,356 | Aurora Loan Servs. (Aurora) | $16,555 | JP Morgan Chase Bank N.A. | $15,814 | $40,725 |
| 2009 | PNC Mortg. Servs., Inc. | 6,428 | Aurora | 16,272 | Chase Home Finance LLC | 8,352 | 31,052 |

Loan account No. 7716 was a home equity line of credit (Chase HELOC).

Petitioners applied for the Chase HELOC on March 14, 2003, and were approved for an initial amount of $160,000. They used $54,499 from the Chase HELOC to pay off a mortgage with World Savings & Loan. As of January 26,

**[*8]** 2006, petitioners' outstanding principal balance on the Chase HELOC was $111,862. As a result of cash advances petitioners took and checks they wrote to third parties throughout 2006, their balance on the Chase HELOC rose to $245,979 as of December 23, 2006. From January 26, 2008, through January 24, 2009, their balance remained $245,979 because they made interest-only payments and took no further advances.

The record does not disclose any changes in the Chase HELOC's principal balance after January 24, 2009. It is also silent as to: (1) the initiation dates and principal balances during the years at issue of petitioners' other two mortgages, and (2) the purpose(s) for which petitioners used the funds borrowed via the Chase HELOC and the other mortgages.

III.  Business Vehicles

During 2008 and 2009 Mr. Ocampo used at least three trucks in his business: (1) a 1997 Chevy Cheyenne 3500, (2) a 1997 Ford F250, and (3) a 2006 Ford F250.

Mr. Ocampo purchased the 1997 Ford F250 from a previous owner for $4,200 on February 16, 2008. He acquired the 2006 Ford F250 new, on July 26, 2005, for $25,380 using a car loan from Chase. The promissory note and the security agreement with Chase stated an annual interest rate of 7.5%, indicated that Mr. Ocampo would use the truck for personal rather than business purposes, and

[*9] called for 60 monthly installments of $510 on the ninth day of each month, with the final installment due August 9, 2010. Petitioners' WAMU and UCU account records for the years at issue reflect the following payments to Chase Auto Finance:

| Date | Amount | Account |
|------|--------|---------|
| 2/5/08 | $510 | UCU |
| 3/14/08 | 1,035 | UCU |
| 4/15/08 | 525 | UCU |
| 5/30/08 | 510 | UCU |
| 6/27/08 | 510 | UCU |
| 7/10/08 | 510 | WAMU |
| 8/8/08 | 510 | WAMU |
| 9/10/08 | 510 | WAMU |
| 10/17/08 | 510 | WAMU |
| 11/14/08 | 510 | WAMU |
| 12/5/08 | 510 | WAMU |
| 1/18/09 | 510 | WAMU |
| 2/18/09 | 510 | WAMU |
| 3/6/09 | 510 | WAMU |
| 4/7/09 | 510 | WAMU |
| 5/5/09 | 510 | WAMU |
| 6/1/09 | 510 | WAMU |

| [*10] | 7/17/09 | 510 | WAMU |
| | 8/18/09 | 510 | WAMU |
| | 9/3/09 | 510 | WAMU |
| | 10/18/09 | 510 | WAMU |

## IV. Tax Reporting

Petitioners filed joint Federal income tax returns for 2008 and 2009 on May 4, 2011. Both returns were filed late.

### A. Mortgage Interest

On Schedules A, Itemized Deductions, petitioners claimed deductions for home mortgage interest of $24,229 for 2008 and $11,745 for 2009. On Forms 8829, Expenses for Business Use of Your Home, they reported deductible mortgage interest of $33,896 for 2008 and $16,431 for 2009 and computed the business percentage as 28.52% for both years. As a result of this computation, of the aggregate $13,026 of expenses for business use of their home for which petitioners claimed a deduction on their 2008 Schedule C, $9,667 consisted of home mortgage interest. Of the aggregate $7,611 of expenses for business use of their home for which petitioners claimed a deduction on their 2009 Schedule C, $4,686 consisted of home mortgage interest. Hence, on Schedules A and C,

**[*11]** petitioners deducted aggregate mortgage interest expense of $33,896 for 2008 and $16,431 for 2009.

With their 2008 Form 8829 petitioners provided a supporting statement indicating that they had computed total deductible mortgage interest as the sum of (1) $15,814 paid to JPMorgan/Chase, which was the amount reported on Form 1098 for the Chase HELOC, (2) $16,556 paid to Aurora, which was the amount reported on Form 1098 for the Aurora mortgage, and (3) $1,526 paid on a "HELOC" (apparently a second one), which was less than the $8,356 reported by National City Mortgage Services on petitioners' third 2008 Form 1098.

With their 2009 Form 8829 petitioners provided a supporting statement indicating that they had computed deductible mortgage interest as equal to the sum of $16,431 of interest paid on the Aurora mortgage--more than the $16,272 reported to them by Aurora on Form 1098--and zero interest paid to JPMorgan/Chase, even though Chase Home Finance LLC reported receiving $8,352 of mortgage interest in 2009 on Form 1098.  The statement does not include petitioners' third mortgage.

B.    Gross Income

Among other items, petitioners reported the following income on their 2008 and 2009 Forms 1040:

| [*12] Income | 2008 | 2009 |
|---|---|---|
| Wages, salaries, tips, etc. | $34,659 | $37,039 |
| Taxable interest | 51 | 2 |
| Business income | 96,473 | 29,458 |

The amounts petitioners reported as wage income match the amounts UCLA reported having paid Ms. Padilla on Forms W-2, Wage and Tax Statement. Bank records for the UCU account reflect that UCU paid petitioners interest of $17 during 2008 and $3 during 2009.

On their Schedules C for Ocampo's Landscaping petitioners reported gross receipts of $384,107 for 2008 and $289,255 for 2009.

C.    Business Expenses

On their Schedules C petitioners claimed deductions for, among others, the following expenses:

| Expense | 2008 | 2009 |
|---|---|---|
| Car and truck | $32,106 | $38,989 |
| Other: | 21,075 | 59,241 |
| Additional auto | 421 | -0- |
| Additional supplies | 762 | -0- |
| Bank service charges | 97 | 1,040 |
| Cell phone/Sprint | 1,826 | -0- |

| | | |
|---|---|---|
| [*13] Computer/Internet | 80 | 918 |
| Dues/subscriptions | 155 | 717 |
| Fees | -0- | 249 |
| Gifts/incentives | 971 | 785 |
| Interest | 11,647 | 8,176 |
| Janitorial expense | 359 | -0- |
| Miscellaneous | -0- | -0- |
| Office supplies | 2,284 | 533 |
| Outside services | -0- | 6,285 |
| Parking | 3 | -0- |
| Payroll expense | -0- | 25,212 |
| Postage and delivery | 303 | 43 |
| Printing/reproduction | 6 | -0- |
| Professional fees | -0- | 9,365 |
| Rubbish removal | 2,036 | 2,892 |
| Telephone | -0- | 2,656 |
| Tools equipment | -0- | 370 |
| Uniforms/protective clothing | 125 | -0- |

Petitioners did not separately claim depreciation for either year. On their 2008 Schedule C, Part IV, "Multiple Auto Statement", petitioners reported using five vehicles for Ocampo's Landscaping, as follows:

| [*14] | Veh. 1 | Veh. 2 | Veh. 3 | Veh. 4 | Veh. 5 |
|---|---|---|---|---|---|
| Date placed in service | 1/1/06 | 1/1/08 | 1/1/97 | 1/1/08 | 1/1/08 |
| Business miles | 25,104 | 20,597 | 15,147 | 20,214 | 3,052 |
| Commuting miles | -0- | -0- | -0- | -0- | -0- |
| Personal miles | -0- | -0- | -0- | -0- | 4,982 |

On their 2009 Schedule C, Part IV, "Multiple Auto Statement", petitioners again reported using five vehicles for Ocampo's Landscaping, as follows:

| | Veh. 1 | Veh. 2 | Veh. 3 | Veh. 4 | Veh. 5 |
|---|---|---|---|---|---|
| Date placed in service | 1/1/06 | 1/1/08 | 1/1/08 | 1/1/08 | 1/1/08 |
| Business miles | 30,547 | 25,147 | 20,569 | 10,254 | 3,057 |
| Commuting miles | -0- | -0- | -0- | -0- | -0- |
| Personal miles | -0- | -0- | -0- | -0- | 9,490 |

On neither tax return did petitioners report having placed a vehicle in service on or after February 16, 2008, the date on which Mr. Ocampo purchased the 1997 Ford F250.

V.    Return Examination

Internal Revenue Service (IRS) Revenue Agent Dominique Franks (RA Franks), who holds a bachelor's degree in business administration, business, and accounting and a master's degree in business administration and accounting, examined petitioners' 2008 and 2009 Federal income tax returns.  On July 17,

- 15 -

**[*15]** 2013, respondent mailed petitioners a notice of deficiency for their 2008 and 2009 tax years determining deficiencies, additions to tax, and penalties as noted above.

### A. Bank Deposits Analysis

As part of her examination, on the basis of records obtained via subpoena from WAMU, UCU, and the Market, RA Franks prepared summaries and analyses of petitioners' bank deposits and of checks cashed at the Market.[4]

#### 1. 2008

##### a. Examiner's Computations

For 2008 RA Franks classified as taxable all checks deposited into the WAMU account, with the exception of a $32 refund from AT&T deposited July 3, 2008. She computed total WAMU deposits during 2008 of $192,795, computed the sum of all checks deposited in 2009 but dated for (and ostensibly, constructively received by petitioners in) 2008 as $36,700, then added the two amounts to reach net taxable deposits into the WAMU account of $229,495. She

---

[4]In disputing respondent's determinations of unreported income for both tax years, petitioners allege that: (1) RA Franks made computational errors in the bank deposits analysis, and (2) some deposits she classified as taxable were in fact nontaxable. The Court has examined both petitioners' bank account records and the bank deposits analysis and has identified computational and transcription errors as well as apparently inadvertent omissions. We address these factual findings here.

[*16] did not subtract the amount of the AT&T refund she had herself classified as nontaxable. After analyzing and classifying the 2008 deposits into the UCU account, RA Franks computed total deposits and interest of $114,799, from which she debited $17,714 of nontaxable transfers, leaving net taxable deposits of $97,085.

RA Franks computed petitioners' total taxable deposits into their two accounts as $326,580. She then added $4,928, the approximate amount of Federal tax withheld from Ms. Padilla's 2008 wages,[5] to reach total net taxable deposits of $331,508. RA Franks computed the total amount of checks cashed at the Market during 2008 as $152,057, then debited the sum of two checks petitioners received as reimbursements to reach a net taxable amount of $139,057. She computed petitioners' unreported Schedule C gross receipts and other income as, respectively, $38,594 and $14,544.[6] Consistent with RA Franks' computations, in

[5]Ms. Padilla's 2008 Form W-2, which petitioners filed with their 2008 return, reflects withholding amounts of: (1) $2,185 for Federal income tax, (2) $2,224 for Social Security tax, and (3) $520 for Medicare tax, for total Federal tax withheld of $4,929. Also reflected on the Form W-2 was California State income tax withholding of $246, which RA Franks was aware of but elected not to consider or adjust for.

[6]On another page of her workpaper RA Franks appears to have mistakenly replaced the total for checks cashed at the Market, $139,057, with $192,795, the total deposits into the WAMU account, in computing "Net Taxable Including the

(continued...)

[*17] the notice of deficiency respondent determined that for 2008 petitioners had received but failed to report additional business gross receipts of $38,594 and other income of $14,544.

### b. Correct Computations

In computing net taxable deposits into the WAMU account, RA Franks failed to reduce total deposits by the $32 AT&T refund. Had she done so, she would have computed net taxable deposits into that account as $192,763. Otherwise, petitioners' WAMU account records and the records supplied by the Market in response to RA Franks' subpoena align with her computations and conclusions. Considered alongside these other records, however, petitioners' UCU account records and RA Franks' workpapers reflect that RA Franks should have computed their net taxable deposits for that account as follows:[7]

---

[6](...continued)
checks cashed" of $524,302, resulting in an incorrect total potential unreported income for 2008 of $105,485. In computing the actual unreported income, it appears that RA Franks corrected this mistake, and the unreported income determined in the notice of deficiency matches the corrected computation described in the text.

[7]Spreadsheets reflecting the Court's classification of deposits and computations for the UCU account are attached as appendixes.

| [*18]    Items | Amount |
| --- | --- |
| Cash[1] | $30,100 |
| Interest | 17 |
| Nontaxable transfers, refunds, etc. | [2]33,914 |
| Schedule C gross receipts | 21,049 |
| Unknown | 1,344 |
| Wages | 28,375 |
| Total | 114,799 |
| Net taxable deposits | 80,885 |

[1]RA Franks classified all cash deposits as gross receipts of Ocampo's Landscaping. Petitioners contend that these deposits consisted of cash obtained by cashing checks at the Market and that if the amounts of checks cashed at the Market are included in their income, then these deposits should be treated as nontaxable transfers. We list cash deposits separately because of this dispute as to their classification.

[2]RA Franks' workpapers describe several deposits as "Missing" or "Unable to locate", and although she did not expressly classify these deposits as taxable, she did not debit them from total deposits in computing net taxable deposits. Petitioners' WAMU account records for 2008, which include canceled checks written on that account, reflect that, of the deposits into the UCU account that RA Franks identified as missing or unknown, the following were in fact additional nontaxable transfers from the WAMU account: $2,000 of the $2,472 deposit on August 14 (WAMU check No. 1014); $1,000 deposit on September 19 (WAMU check No. 1030); $2,000 deposit on September 26 (WAMU check No. 1031); $2,500 of the $2,686 deposit on October 14 (WAMU check No. 1036); $2,000 of the $2,148 deposit on October 21 (WAMU check No. 1038); and $3,700 deposit on December 10 (WAMU check No. 1055).

Together with petitioners' UCU account records for 2008, which include copies of checks deposited into that account, the WAMU records also reflect that the $3,000 deposit made on August 29, 2008, which RA Franks noted as a $3,000 check from Jacob Gooze and classified as taxable gross receipts of Ocampo's Landscaping, was in fact a nontaxable transfer from the WAMU account. When UCU provided petitioners' account records to RA Franks pursuant to a subpoena, it erroneously included one canceled check that had been deposited into an account other than the UCU account. Jacob Gooze in fact wrote check No. 501, for $3,000, to Cari Chanin, who signed the back of the check and marked it "for deposit only"

[*19] into an account with an account number ending in 0801. Petitioners' UCU account number ends with 3734. Petitioners' WAMU account records include a copy of the $3,000 check to Ms. Padilla, dated August 28, 2008, that was deposited into the UCU account on August 29, 2008.

In total, of the missing or unknown deposits into the UCU account that RA Franks treated as taxable income, $16,200 was in fact from nontaxable transfers from the WAMU account.

Had she used these numbers, RA Franks should have computed total net taxable deposits, including checks cashed at the Market, of $412,705,[8] unreported Schedule C gross receipts of $35,562, and unreported other income of $1,344.

### 2. 2009

#### a. Examiner's Computations

For 2009 RA Franks computed total deposits into the WAMU account of $269,323. She classified as nontaxable the $36,700 deposited in 2009 but dated for 2008 that she had allocated to 2008 income. She also classified as nontaxable an $802 reimbursement check from La Casa Investments, LLC, a $1,660 temporary credit MC, and a $503 payment from "Waterside/Mdr", computing the total of these payments as $2,965. Treating all other check and cash deposits into the WAMU account as taxable, RA Franks then subtracted the 2008 dated checks and the other three items she had classified as nontaxable to reach net taxable deposits

---

[8]$192,763 (net taxable WAMU deposits) + $80,885 (net taxable UCU deposits) + $139,057 (net taxable amount for checks cashed at the Market) = $412,705.

[*20] of $229,658. For the UCU account RA Franks computed total 2009 deposits of $69,160. In her final computations for that account, she treated $15,058 of deposits as nontaxable and determined net taxable deposits of $54,101.

RA Franks computed petitioners' total net taxable deposits into their two accounts as $283,759. She then added $4,790, the approximate amount of Federal tax withheld from Ms. Padilla's 2008 wages,[9] again ignoring California State withholding, to reach total net taxable deposits of $288,549. RA Franks computed the total amount of checks cashed at the Market during 2009 as $92,112. She added this amount to petitioners' total net taxable deposits to reach taxable income of $380,661. Of this amount, she classified all deposits into the WAMU account and checks cashed at the Market as Schedule C gross receipts. She computed petitioners' unreported Schedule C income as $32,515 and their unreported other income as $4,387. Consistent with these computations, in the notice of deficiency respondent determined that for 2009 petitioners had received but failed to report additional business income of $32,515 and other income of $4,387.

---

[9]The photocopy in the record of Ms. Padilla's 2009 Form W-2, which petitioners filed with their 2009 return, is cut off and so does not show the actual amounts of Federal income tax, Social Security tax, and Medicare tax withheld. Petitioners' 2009 Form 1040, at line 61, reports Federal income tax withholding of $1,860.

[*21]        b.        Correct Computations

For the UCU account, RA Franks computed net taxable deposits of $54,101,
treating only $15,058 as nontaxable.  Her item-by-item analysis, however,
identifies the following deposits as nontaxable:

| Check date | Deposit date | Payor | Amount |
|---|---|---|---|
| 1/12/09 | 1/13/09 | Ocampo's (check No. 1067) | $1,500 |
| 1/24/09 | 1/27/09 | Ocampo's (check No. 1076) | 1,500 |
| 2/13/09 | 2/13/09 | Ocampo's (check No. 1080) | 3,800 |
| 3/9/09 | 3/9/09 | Ocampo's (check No. 1093) | [1]2,600 |
| 4/10/09 | 4/10/09 | Ocampo's (check No. 1112) | 2,000 |
| | 4/13/09 | Deposit L-9 (line of credit) | 240 |
| 5/5/09 | 5/5/09 | Ocampo's (check No. 1114) | 2,000 |
| | 5/5/09 | Deposit L-9 (line of credit) | 48 |
| | 5/5/09 | UCU (fee refund) | 20 |
| 5/14/09 | 5/14/09 | Ocampo's (check No. 1120) | 3,000 |
| 6/20/09 | 6/22/09 | Ocampo's (check No. 1140) | 1,500 |
| 7/9/09 | 7/9/09 | Ocampo's (check No. 1154) | 2,000 |
| | 7/29/09 | Deposit L-9 (line of credit) | 13 |
| 8/6/09 | 8/6/09 | Ocampo's (check No. 1163) | 3,000 |
| | 8/11/09 | Target (purchase return) | 42 |
| 9/4/09 | 9/4/09 | Ocampo's (check No. 1195) | 3,000 |
| | 9/17/09 | Office Depot (purchase return) | 36 |
| 10/7/09 | 10/9/09 | Ocampo's (check No. 1236) | 1,800 |
| 10/21/09 | 10/23/09 | Ocampo's, Inc.[2] (check No. 1006) | 1,600 |

| | | | | |
|---|---|---|---|---|
| **[*22]** | 11/17/09 | 11/18/09 | Ocampo's, Inc. (check No. 1029) | 2,200 |
| | | 11/23/09 | Deposit L-9 (line of credit) | 21 |
| | | 12/7/09 | Deposit L-9 (line of credit) | 219 |
| | 12/14/09 | 12/15/09 | Ocampo's, Inc. (check No. 1049) | 4,000 |
| | | 12/22/09 | Petco (purchase return) | 20 |
| | Total | | | 36,159 |

[1]RA Franks' item-by-item analysis does not expressly denote this $2,600 check as nontaxable but instead interprets the "exp." on the memo line as "expenses". On brief respondent contends that RA Franks treated the check as taxable other income. RA Franks classified all other checks from Ocampo's (before its incorporation, see infra) as nontaxable transfers, and she explained that for 2009 she classified as other income only those deposits which were missing or for which she "could not get * * * an explanation" from either UCU or petitioners. We therefore see no basis for respondent's contention and in any event no reason to treat the transfer as taxable.

[2]The California secretary of state's online business entity records reflect that Mr. Ocampo organized a corporation, Ocampo's, Inc., on August 25, 2009, and he opened a new bank account for the corporation. Petitioners did not file an S election for the corporation until 2012. RA Franks concluded that the checks petitioners received from the corporation were "constructive dividends". In the notice of deficiency respondent determined that petitioners had received but failed to report $19,100 of qualified dividends from their wholly owned corporation. Although it is unclear from the record how respondent arrived at the amount of $19,100, we presume that respondent classified the checks from Ocampo's, Inc., that were deposited into the UCU account, among others, as dividends. Respondent conceded his qualified dividend income determination in the stipulation of settled issues, see supra note 2, and has neither proposed nor argued for an alternative characterization of the funds transferred from Ocampo's, Inc. The Court will therefore treat these transfers as nontaxable returns of capital.

In sum, RA Franks' item-by-item analysis reflects corrected total nontaxable deposits of $36,159. Had RA Franks used this number for nontaxable deposits, she would have computed net taxable deposits into the UCU account of $33,001. The

[*23] UCU account records show that, of this amount, $30,612 consisted of Ms. Padilla's wages and $3 consisted of interest. Hence, had RA Franks computed petitioners' unreported income consistent with her item-by-item analysis, she would have determined unreported other income of $2,387[10] rather than $4,387.

### B. Expense Examination

In addition to conducting a bank deposits analysis, RA Franks examined the deductions petitioners claimed on Schedule C.

#### 1. Car and Truck Expense

Petitioners presented receipts and invoices to RA Franks to substantiate their claimed deduction for car and truck expense. She allowed deductions for some of the expenses reflected in these records but disallowed others because she could not read them, because they had already been allowed, or because they were not, in her determination, ordinary and necessary business expenses. In the notice of deficiency respondent allowed deductions for $10,055 of car and truck expenses for 2008 and $14,544 for 2009.

---

[10]UCU paid petitioners $2.67 of interest during 2009. On their 2009 Federal income tax return they rounded that amount down to $2 instead of up to $3, so $1 of the $2,387 of unreported income consists of interest. Respondent treated this $1 as other income in the notice of deficiency, and for simplicity, we will do the same.

[*24] The portions of petitioners' receipts and invoices that respondent entered into evidence--some (but not necessarily all) of which represent expenses RA Franks allowed--reflect the following odometer readings for some of petitioners' vehicles:

| | 2008 | | 2009 | | | |
|---|---|---|---|---|---|---|
| Vehicle | 2/23 | 8/14 | 5/4 | 12/18 | 12/22 | 12/31 |
| 1997 Chevy 3500 | --- | --- | --- | 121,090 | --- | --- |
| 1997 Ford F250 | 113,687 | --- | --- | --- | --- | --- |
| 2006 Ford F250 | --- | 55,598 | 66,295 | --- | 74,822 | 75,115 |

After RA Franks had reviewed their evidence of vehicle operating expenses, petitioners submitted to respondent handwritten, detailed daily mileage logs showing the following business miles driven:[11]

---

[11]Respondent objected to the logs' admission into evidence on the basis that they were irrelevant and prepared in anticipation of litigation. We provisionally admitted the exhibits subject to respondent's objection. On brief respondent contends the logs should be excluded because they are not credible. The Federal Rules of Evidence do not specifically provide for the exclusion of evidence on the basis that it was prepared in anticipation of litigation or lacks credibility. These are bases for giving the evidence little weight, not for excluding it. As for respondent's relevancy objection, Fed. R. Evid. 401 sets a low bar for relevancy, and the logs clear it because they support petitioners' claim for car and truck expense deductions under the standard mileage method. We give them weight commensurate with their probative value.

[*25]

| Vehicle | 2008 | 2009 |
|---|---|---|
| 1997 Chevy 3500 | 10,875.8 | 10,963.5 |
| 1997 Ford F250 | 11,380.0 | 11,749.0 |
| 2006 Ford F250 | 55,107.5 | 28,580.2 |
| 1995 Nissan | --- | 27,809.3 |

Most of petitioners' mileage logs appear to have been created in spiral notebooks and list addresses and locations along with daily mileage numbers. Petitioners' 2009 log for the 1995 Nissan, however, appears to have been created by hand on computer-generated weekly and monthly calendar pages. The date stamp in the lower right-hand corner of each calendar page indicates that the pages were printed on July 15, 2014, from 12:47 p.m. to 3:24 p.m., with each page having been printed at 3:24 p.m. except the first page, printed at 12:47 p.m.

RA Franks rejected and did not consider petitioners' mileage logs, which she had never seen before the trial. She rejected them both because she believed that petitioners were bound by their original claim for actual car and truck expenses and because neither petitioners nor the logs themselves provided opening and closing odometer readings for each tax year.

**[\*26]**     2.     Other Expenses

For both 2008 and 2009 RA Franks disallowed deductions for the interest expenses claimed on petitioners' Schedules C for lack of substantiation and for failure to prove to her they were ordinary and necessary. She did not examine and made no adjustments to the mortgage interest expense deductions petitioners claimed on their Schedules A or to the deductions for business use of their home-- which were attributable in part to mortgage interest expenses reported on Forms 8829--claimed on their Schedules C.

Petitioners' claimed $11,647 deduction for interest is the only other expense remaining in dispute for 2008. For 2009 $16,912 of petitioners' claimed other expense deduction, including the $8,176 claimed for business interest, remains in dispute.[12]

---

[12]The stipulation of settled issues frames the amount of other expense for 2009 remaining in dispute as follows: "For tax year 2009, petitioners claimed Schedule C other expenses in the amount of $59,241.00 on their income [tax] * * * return. The notice of deficiency sets forth an adjustment for disallowed Schedule C other expenses in the amount of $40,458.00. Respondent concedes that petitioners are entitled to Schedule C other expenses in the amount of $23,546.00." The final sentence could be interpreted in either of two ways: Respondent has conceded petitioners are entitled to either other expenses of $23,546 in total, such that $35,695 remains in dispute, or other expenses of $23,546 in addition to the $18,783 allowed in the notice of deficiency, such that $16,912 remains in dispute. In his posttrial brief respondent adopts the latter interpretation, so the Court will follow suit.

[*27] VI.    Disputed Amounts

Petitioners timely petitioned this Court on August 30, 2013.  We tried their case December 3, 2014.  To summarize, after the Court's corrections to RA Franks' incorrect factual statements and computations, the amounts of income and expense remaining at issue and analyzed in this opinion are as follows:

| Item | 2008 | 2009 |
|---|---|---|
| Sched. C gross receipts | $35,562 | $32,515 |
| Other income | 1,344 | 2,387 |
| Car and truck expenses | 22,051 | 24,445 |
| Other expenses (total): | 11,647 | 16,912 |
| Interest | 11,647 | 8,176 |
| Other | -0- | 8,736 |

OPINION

The Commissioner's determination of a taxpayer's tax liability is generally presumed correct, and the taxpayer bears the burden of proving the determination improper.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  This rule generally governs the nonpenalty issues in this case.[13]

---

[13]In their posttrial briefs petitioners assert "[t]hat the appropriate standard of review to be applied by this Court in this case is whether or not the respondent's revenue agent had the skills and knowledge to conduct this examination with accuracy to determine the correct amount of tax liability owed by the petitioners

(continued...)

[*28] I.    Underlined Unreported Income

Because of the difficulty inherent in proving a negative, where the

Commissioner determines that a taxpayer received unreported income he must

"offer some substantive evidence showing that the taxpayer received income from

the charged activity" before he may rely upon the presumption of correctness.

Weimerskirch v. Commissioner, 596 F.2d 358, 360 (9th Cir. 1979), rev'g 67 T.C.

672 (1977).[14]  If the Commissioner provides a "minimal factual foundation" for his

[13](...continued)
for the tax years 2008 and 2009."  Although we recognize that unrepresented taxpayers such as petitioners may view proceedings in this Court as an opportunity to redress perceived unfairness during the audit process, that is not how the governmental proceedings work.

"[A] trial before the Tax Court is a proceeding de novo", and "[a]s a general rule, this Court will not look behind a deficiency notice to examine the evidence used or the propriety of respondent's motives or of the administrative policy or procedure involved in making his determinations." Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 327-328 (1974).  For an exception to this rule see Scar v. Commissioner, 814 F.2d 1363 (9th Cir. 1987), rev'g 81 T.C. 855 (1983). We thus consider a taxpayer's tax liability afresh, on the basis of evidence introduced at trial, without regard to what happened during the examination or during any interactions between the taxpayer and the IRS Appeals Office.  We weigh that evidence subject to our Rules and the U.S. Supreme Court's decision in Welch v. Helvering, 290 U.S. 111, 115 (1933), which provide that the taxpayer has the affirmative obligation to prove the Commissioner's determinations incorrect.

[14]This Court "follow[s] a Court of Appeals decision which is squarely in point where appeal from our decision lies to that Court of Appeals and to that court alone." Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d
(continued...)

[*29] determination, the burden of proof shifts to the taxpayer. Palmer v. United States, 116 F.3d 1309, 1312 (9th Cir. 1997); accord Petzoldt v. Commissioner, 92 T.C. 661, 689 (1989). At this second stage, the taxpayer must endeavor to rebut the presumption in favor of the Commissioner's determination "by establishing by a preponderance of the evidence that the deficiency determination is arbitrary or erroneous." Rapp v. Commissioner, 774 F.2d 932, 935 (9th Cir. 1985).

A.    Respondent's Evidentiary Foundation

The Commissioner may employ any reasonable method to reconstruct a taxpayer's income and thereby lay the requisite evidentiary foundation. See Petzoldt v. Commissioner, 92 T.C. at 693; see also Palmer, 116 F.3d at 1312 (stating that the method of reconstructing income need only be "rationally based"). For example, "[t]he use of the bank deposit method for computing unreported income has long been sanctioned by the courts." Clayton v. Commissioner, 102 T.C. 632, 645 (1994); see also Weimerskirch v. Commissioner, 596 F.2d at 362 (listing the taxpayer's bank deposits as one means by which the Commissioner could have attempted to substantiate the charge of unreported income). The

---

[14](...continued)
985 (10th Cir. 1971). When they filed their petition, petitioners lived in California, a State within the jurisdiction of the Court of Appeals for the Ninth Circuit, so we will follow decisions of that court. See sec. 7482(b)(1)(A).

[*30] method "assumes that all money deposited in a taxpayer's bank account during a given period constitutes taxable income". Clayton v. Commissioner, 102 T.C. at 645. Although the Commissioner must "take into account any nontaxable source or deductible expense of which * * * [he] has knowledge", "[b]ank deposits are prima facie evidence of income". Id. at 645-646.

RA Franks employed the bank deposits method to reconstruct petitioners' 2008 and 2009 income. She computed total deposits into the WAMU and UCU accounts as well as total checks cashed at the Market. To the extent of her knowledge, she attempted to eliminate nontaxable deposits and receipts. She strived to follow the procedure we sanctioned in Clayton. In our factual findings we have addressed and corrected the numerous errors in her transcription and computations. Even after these corrections, her bank deposits analysis, which rests upon records supplied by petitioners' banks and the Market, reveals receipts in excess of the amounts petitioners reported on their Federal income tax returns. Consequently, we conclude that respondent has established the requisite minimal evidentiary foundation for his determination of unreported income.

B.    Petitioners' Evidentiary Riposte

Petitioners have the burden of showing that the unreported deposits and receipts were not taxable income. To that end, for 2008, they contend that (1) a

[*31] $3,000 check from Marisol Ocampo that Mr. Ocampo cashed at the Market

was a loan from his sister; (2) the cash deposited into the UCU account came from

checks cashed at the Market, not from clients of Ocampo's Landscaping; and (3) an

$8 deposit into the UCU account, the canceled check or other source document for

which is missing from the record, was too small in amount to be a payment from

one of Mr. Ocampo's clients.

Petitioners have offered no argument concerning the unreported business and

other income respondent determined for 2009. Consequently, we treat these

determinations as conceded.

### 1. Marisol Ocampo Loan

During 2008, on a date not revealed in the record, Mr. Ocampo cashed at the

Market a $3,000 check from Marisol Ocampo made out to "Vincente Ocampo".

The check is dated July 25, 2008, and the memo line is blank. The address printed

below Marisol Ocampo's name is approximately 1.5 miles and 5 minutes by car

from petitioners' home address. Marisol Ocampo shares Mr. Ocampo's surname,

and Mr. Ocampo identified her at trial as his sister and stated that the check

represented a personal loan.

For tax purposes, a loan is "'an agreement, either expressed or implied,

whereby one person advances money to the other and the other agrees to repay it

**[*32]** upon such terms as to time and rate of interest, or without interest, as the parties may agree.'" Commissioner v. Valley Morris Plan, 305 F.2d 610, 618 (9th Cir. 1962) (quoting Nat'l Bank of Paulding v. Fid. & Cas. Co., 131 F. Supp. 121, 123-124 (S.D. Ohio 1954)), rev'g in part 33 T.C. 720 (1960) and 33 T.C. 572 (1959). Whether an advance constitutes a loan is a question of fact. Fisher v. Commissioner, 54 T.C. 905, 909 (1970).

In determining whether a payment constitutes a loan, "we examine the transaction as a whole." Welch v. Commissioner, 204 F.3d 1228, 1230 (9th Cir. 2000), aff'g T.C. Memo. 1998-121.

> The conventional test is to ask whether, when the funds were advanced, the parties actually intended repayment. * * *
>
> However, courts have considered a number of other factors as relevant in assessing whether a transaction is a true loan, such as: (1) whether the promise to repay is evidenced by a note or other instrument; (2) whether interest was charged; (3) whether a fixed schedule for repayments was established; (4) whether collateral was given to secure payment; (5) whether repayments were made; (6) whether the borrower had a reasonable prospect of repaying the loan * * *; and (7) whether the parties conducted themselves as if the transaction were a loan." * * * [Id.]

"No one factor is necessarily determinative, and the factors considered do not constitute an exclusive list." Calloway v. Commissioner, 135 T.C. 26, 37 (2010), aff'd, 691 F.3d 1315 (11th Cir. 2012).

- 33 -

[*33] The Court credits Mr. Ocampo's statement that Marisol Ocampo is his sister. It is not apparent from the record, however, that the siblings intended repayment at the time the funds were transferred. Petitioners did not introduce any written instrument memorializing the alleged loan although, given the parties' relationship and the relatively modest sum involved, the absence of a writing is hardly surprising. As a result, we do not know whether interest was charged, collateral was given, or a fixed payment schedule was agreed upon. The record before the Court contains no evidence of any payments to Marisol Ocampo during 2008 or 2009, and Mr. Ocampo did not testify to having made payments on the alleged loan during the years at issue or afterward.

Nevertheless, given the parties' relationship and the relatively modest sum involved, the Court finds that--if Mr. Ocampo and his sister did not intend at the time of the advance that he would repay her--the $3,000 check was a (nontaxable) gift. See sec. 102(a). Some of Mr. Ocampo's landscaping clients (who may have been maintenance clients) did write checks in amounts less than or equal to $3,000, so the amount of the Marisol Ocampo check does not rule out its being for services. But generally Mr. Ocampo's landscaping clients wrote him multiple checks during the years at issue, with their periodicity suggesting either regular landscaping maintenance work and/or installment payments on a large project. Marisol

[*34] Ocampo's single check does not fit this pattern and was made out to petitioner in his individual name. There is no evidence in the record that he ever performed any services for her or ever sold her anything. Moreover, given that Mr. Ocampo performed $152,000 worth of landscaping work for his brother-in-law and, despite the lapse of several years, has taken no formal steps to secure payment, we doubt that he would have charged his sister for a $3,000 job.

From all the evidence before us, we conclude that, whether as a loan or a gift, the $3,000 check from Marisol Ocampo was not income to petitioners.

### 2. Cash Deposits

During the 2008 tax year Mr. Ocampo cashed checks at the Market and cash deposits were made into petitioners' UCU account. Respondent classified these deposits as Schedule C gross receipts of Ocampo's Landscaping, but petitioners contend they were instead deposits of cash obtained from the Market, such that respondent has double-counted the underlying income. The evidence in the record supports petitioners' argument.

The following table sets out, for 2008, (1) the dates on and amounts of some of the checks cashed at the Market, (2) the dates of cash deposits into the UCU account, and (3) the deposit dates for transfers from the WAMU account to the UCU account:

| [*35] Checks cashed | | Cash deposits | | Transfers | |
|---|---|---|---|---|---|
| Date on check | Amount | Date deposited | Amount | Date deposited | Amount |
| --- | --- | 1/3 | $5,000 | --- | --- |
| --- | --- | 1/11 | 5,000 | --- | --- |
| 2/6 | $5,000 | 2/6 | 2,800 | --- | --- |
| 3/12 | 9,000 | 3/14 | 5,000 | --- | --- |
| 4/2 | 9,000 | 4/9 | 4,000 | --- | --- |
| 5/2 | 9,000 | --- | --- | --- | --- |
| 5/8 | 8,000 | 5/22 | 2,400 | --- | --- |
| | | 5/28 | 1,700 | --- | --- |
| 6/5 | 3,175 | 6/11 | 3,000 | --- | --- |
| | | | | 7/9 | $3,000 |
| | | | | 8/14 | 2,000 |
| [1]8/13 | 8,000 | [1]8/20 | 1,200 | 8/29 | 3,000 |
| --- | --- | --- | --- | 9/9 | 2,000 |
| --- | --- | --- | --- | 9/19 | 1,000 |
| --- | --- | --- | --- | 9/26 | 2,000 |
| --- | --- | --- | --- | 10/14 | 2,500 |
| --- | --- | --- | --- | 10/21 | 2,000 |
| --- | --- | --- | --- | 11/19 | 1,400 |
| --- | --- | --- | --- | 12/10 | 3,700 |
| --- | --- | --- | --- | 12/22 | 2,000 |
| --- | --- | --- | --- | 12/31 | 2,000 |

[*36]     [1]This table depicts only some--not all--of the checks cashed at the Market, but it depicts all of the 2008 cash deposits into the UCU account.  Because no cash deposits were made after August 20, 2008, we have not presented any checks cashed at the Market after that date.

From this data, we observe the following:  (1) all but two of the cash deposits into the UCU account occurred before Mr. Ocampo established the WAMU account on June 10, 2008; (2) the amounts of the cash deposits varied from $1,200 to $5,000; (3) cash was deposited once or twice each month from January through June, then once in August, and never thereafter; (4) each cash deposit occurred within one to three weeks after the date written on a check that was cashed at the Market; (5) the amount of each cash deposit was less than the amount of the most recently cashed check; (6) after Mr. Ocampo established the WAMU account, petitioners wrote checks from that account to the UCU account one to three times each month; and (7) the amounts of those checks varied from $1,000 to $3,700.

 Mr. Ocampo was a sole proprietor and did not receive a regular paycheck. Instead, he testified that he would periodically deposit moneys earned in his business into petitioners' UCU account to "pay" himself and to be used for petitioners' personal expenses.  Mr. Ocampo testified that because of the size of most projects he took on, his business earnings came in the form of checks, not

[*37] cash, and RA Franks, who had interviewed some of his clients in connection with her examination of other tax years, admitted that none of those clients told her they had paid in cash. Before Mr. Ocampo established the WAMU account, he could have "paid" himself from checks received from clients through either of two different means: (1) by depositing a check from a client directly into the UCU account, or (2) by cashing the check at the Market and then depositing some of the cash. As RA Franks' bank deposits analysis and petitioners' account records reflect, he chose the first alternative on four occasions, depositing checks from clients totaling $21,049 into the UCU account on February 8, April 9, April 14, and June 18. Mr. Ocampo testified that he chose the second alternative on several other occasions; and given the pattern apparent from the table above, we credit this testimony.

We conclude that petitioners have adequately established that, of the cash deposits into the UCU account, all but the first two--on January 3 and 11, 2008-- consisted of cash obtained from cashing checks at the Market. Therefore, the amounts of these checks, $20,100 in total, are not includible in their income. Because the record does not reflect any possible nontaxable source for the January 3 and 11 deposits, the dates of which precede the dates on all checks cashed at the

[*38] Market that are in the record, these deposits, which total $10,000, are includible in petitioners' income.

### 3.    De Minimis Deposit

Finally, petitioners contend that an $8 deposit into the UCU account on April 11, 2008, was too small in amount to be a payment from one of Mr. Ocampo's clients and so should not be treated as taxable income. We agree that the amount of that deposit--for which no canceled check or other source document is in the record--strongly suggests that it does not represent gross receipts of Ocampo's Landscaping. But that the deposit was not business income does not mean that it was not income at all. In her bank deposits analysis, RA Franks classified it as other income.[15] Petitioners bear the burden of showing that the $8 deposit was not income--i.e., that it was a transfer, a loan, or a gift or that it was otherwise nontaxable. They have not proposed an alternative characterization for

_____

[15]In addition to the $13,200 of ostensibly missing or unknown deposits that was in fact transferred from the WAMU account and $3,000 that was never deposited into their WAMU account at all total of the two amounts $16,200, see supra pp. 18-19, RA Franks classified the following five missing or otherwise unidentified deposits as other income: an $8 deposit on April 11, a $530 deposit on August 4, the remaining $472 of the $2,472 deposit on August 14, the remaining $186 of the $2,686 deposit on October 14, and the remaining $148 of the $2,148 deposit on October 21. She thus computed total unreported other income of $14,544.

**[\*39]** this deposit, let alone offered any evidence to support that characterization. Consequently, the deposit is includible in their 2008 income.

### 4. Summary

Petitioners have established by a preponderance of the evidence that the $3,000 check from Marisol Ocampo cashed at the Market during 2008 and $20,100 of the cash deposits into the UCU account during 2008 were nontaxable. We will therefore sustain respondent's determination of unreported income only to the following extent:

| Unreported income | 2008 | 2009 |
|---|---|---|
| Sched. C gross receipts | $12,462 | $32,515 |
| Other income | 1,344 | 2,387 |
| Total | 13,806 | 34,902 |

## II. Disallowed Deductions

Deductions are a matter of legislative grace, and taxpayers bear the burden of proving their entitlement to any claimed deduction. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). A taxpayer must identify each deduction available, show that he or she has met all requirements therefor, and keep books or records that substantiate the expenses underlying the deduction. Sec. 6001; Roberts v. Commissioner, 62 T.C. 834, 836 (1974). Under Cohan v.

[*40] <u>Commissioner</u>, 39 F.2d 540, 543-544 (2d Cir. 1930), if a taxpayer claims a deduction but cannot fully substantiate the underlying expense, the Court may generally approximate the allowable amount, "bearing heavily if it [so] chooses upon the taxpayer whose inexactitude is of his own making." The Court must have some factual basis for its estimate, however, else the allowance would amount to "unguided largesse". <u>Williams v. United States</u>, 245 F.2d 559, 560 (5th Cir. 1957); <u>Vanicek v. Commissioner</u>, 85 T.C. 731, 742-743 (1985).

Section 162(a) permits a taxpayer to deduct all of the ordinary and necessary expenses paid or incurred during the taxable year in carrying on the taxpayer's trade or business. "To qualify as an allowable deduction under [section] * * * 162(a) * * * an item must (1) be 'paid or incurred during the taxable year,' (2) be for 'carrying on any trade or business,' (3) be an 'expense,' (4) be a 'necessary' expense, and (5) be an 'ordinary' expense." <u>Commissioner v. Lincoln Sav. & Loan Ass'n</u>, 403 U.S. 345, 352 (1971). An expense satisfies the second element only if it is "directly connected with or pertaining to the taxpayer's trade or business". Sec. 1.162-1(a), Income Tax Regs. An expense qualifies as necessary if it is "appropriate and helpful" to the taxpayer's business, <u>Welch v. Helvering</u>, 290 U.S. at 113, and as ordinary if the underlying transaction is a "common or frequent

**[*41]** occurrence in the type of business involved", see Deputy v. du Pont, 308 U.S. 488, 495 (1940).

While business expenses are generally deductible, personal, living, and family expenses are typically nondeductible. See sec. 262(a). A business expense claimed as a deduction must be incurred primarily for business rather than personal reasons. See Walliser v. Commissioner, 72 T.C. 433, 437 (1979). Where an expense exhibits both personal and business characteristics, the "test[] requires a weighing and balancing of all the facts * * * bearing in mind the precedence of section 262, which denies deductions for personal expenses, over section 162, which allows deductions for business expenses." Sharon v. Commissioner, 66 T.C. 515, 524 (1976) (citing costs of commuting and ordinary clothing as examples of expenses helpful and necessary to an individual's employment that are "essentially personal" and hence nondeductible), aff'd per curiam, 591 F.2d 1273 (9th Cir. 1978).

We apply the foregoing rules to each category of disputed business expenses in turn.

A.    Other Expenses

As set forth above, the $11,647 of other expenses that remains at issue for 2008 consists entirely of business interest. For 2009 the $16,912 of other expenses

[*42] that remains at issue consists of $8,176 of business interest and $8,736 of other, unidentified expenses. Petitioners have offered no explanation for, let alone any evidence to substantiate, this $8,736 of reported expenses, so we will sustain respondent's disallowance of a deduction for them and move on to the interest expense.

For each of 2008 and 2009 petitioners claimed a deduction for an interest expense on their Schedule C, and in their posttrial briefs they contend that both should be allowed as business interest. Specifically, petitioners point to Hector Padilla's testimony that he failed to pay Mr. Ocampo for $152,000 worth of work performed at some point after November 2005. Petitioners reason that, as a result of Mr. Padilla's nonpayment, Mr. Ocampo must have had to borrow to finance the business, so deductions for business interest should be allowed.

Petitioners' substantiation burden requires them to offer evidence, not just commonsense reasoning. Aside from petitioners' tax returns, which represent merely their claims, see Roberts v. Commissioner, 62 T.C. at 837, nothing in the record shows that any business interest was paid in either 2008 or 2009.[16]

_____

[16]Exhibit 38-R contains a copy of Mr. Ocampo's car loan agreement with Chase, and that agreement does provide for interest. Mr. Ocampo incurred the loan to purchase the 2006 Ford F250, which he used in his business even though the loan agreement indicates that the truck was for personal use. Although

(continued...)

[*43] Petitioners allege that the claimed business interest is reported on the Forms 1098 in the record,[17] but they offered no evidence of the purposes for which the funds obtained from those mortgages were used. Nothing ties any of the Forms 1098 to a loan of which some portion was used for business purposes.

_____

[16](...continued)
petitioners' bank records reflect that they made payments on this loan, see supra p. 10, they have not established how much of those payments consisted of interest, nor the extent to which Mr. Ocampo used the Ford F250 for business rather than personal purposes. As set forth more fully infra part II.B, expenses with respect to passenger motor vehicles are subject to heightened substantiation requirements that apply equally to interest expenses incurred with respect to such vehicles. See, e.g., Jackson v. Commissioner, T.C. Memo. 2014-160, at *10. Evidence that petitioners must have paid interest, in some amount, some of which was allocable to their business, does not meet these requirements.

[17]They further contend, presumably in the alternative, that the balance of interest reported on those forms should be allowed as Schedule A deductions. Sec. 163(h) does not, however, permit a deduction for all home mortgage interest. Among other limitations, the statute disallows deductions for interest paid on mortgage loans the funds from which were used to acquire, construct, or substantially improve a taxpayer's home, to the extent the mortgages' aggregate principal balance exceeds $1,000,000. Sec. 163(h)(3)(B)(ii). Further, for home equity loans not used to acquire, construct, or substantially improve the taxpayer's home, the statute disallows interest deductions to the extent the loans' aggregate principal balance exceeds $100,000. Sec. 163(h)(3)(C)(ii). Petitioners offered no evidence that they used the funds from the Chase HELOC or either of their other two mortgages to purchase, construct, or substantially improve their home. They have not established that the balance on the Chase HELOC fell below $100,000 during 2009 or what the balances on their other two loans were in either 2008 or 2009. In short, petitioners have not shown that they are entitled to deduct sec. 163(h) home mortgage interest in any amount greater than the amounts respondent has already allowed.

[*44] Petitioners have failed to carry their burden of proof with respect to deductions for the interest expenses remaining in dispute for both 2008 and 2009.

### B. Car and Truck Expenses

Section 274(d) sets forth heightened substantiation requirements and overrides the Cohan rule with respect to certain kinds of business expenses, including expenses with respect to "listed property" such as passenger automobiles or other property used as a means of transportation.[18] See secs. 274(d), 280F(d)(4)(A); Sanford v. Commissioner, 50 T.C. 823, 827 (1968), aff'd per curiam, 412 F.2d 201 (2d Cir. 1969). To deduct these expenses, a taxpayer must

---

[18]Petitioners contend that because their vehicles were trucks, they do not qualify as passenger automobiles. The Code's definition of a passenger automobile includes "any 4-wheeled * * * [truck] * * * manufactured primarily for use on public streets, roads, and highways, and * * * rated at 6,000 pounds * * * gross vehicle weight or less." Sec. 280F(d)(5)(A). From the make and model information in the record, the Court can conclude only that petitioners' trucks fell within that definition; petitioners have not provided evidence to the contrary. Moreover, petitioners acknowledge that the trucks were used as means of transportation. For purposes of sec. 280F, property used as a means of transportation includes "trucks * * * for transporting persons or goods." Sec. 1.280F-6(b)(2), Income Tax Regs. Petitioners assert that Mr. Ocampo used the trucks to transport equipment to various jobsites, and it seems likely that he also used them to transport materials and workers. They have not established that any of their vehicles had "been specially modified" such that it was "not likely to be used more than a de minimis amount for personal purposes" and therefore exempt from the substantiation requirements of sec. 274(d). See sec. 1.274-5T(k)(7), Temporary Income Tax Regs., 50 Fed. Reg. 46035 (Nov. 6, 1985). Consequently, sec. 274(d) applies.

**[*45]** "substantiate[] by adequate records or by sufficient evidence corroborating the taxpayer's own statement":  (1) the amount of the expense, (2) the time and place of the use of the vehicle, (3) the business purpose of that use, and (4) the business relationship of the taxpayer to the person(s) using the vehicle.  Sec. 274(d).  The taxpayer must establish both the amount of business use of the vehicle and the amount of total use.  See sec. 1.274-5T(b)(6)(i)(B), Temporary Income Tax Regs., 50 Fed. Reg. 46016 (Nov. 6, 1985).

Substantiation by adequate records generally requires the taxpayer to "maintain an account book, diary, log, statement of expense, trip sheet, or similar record" prepared contemporaneously with the use of the vehicle as well as documentary evidence of individual, actual expenditures.  See id. para. (c)(2), 50 Fed. Reg. 46017.  In lieu of substantiating actual expense, a taxpayer may elect to claim a deduction for business use of a passenger automobile using the standard mileage rate established by the Commissioner.  See sec. 1.274-5(j)(2), Income Tax Regs.  Electing this method does not, however, relieve the taxpayer "of the requirement to substantiate the amount of each business use (i.e., the business mileage), or the time and business purpose of each use."  Id.

A taxpayer "is entitled to only one deduction" and may claim it on the basis of either actual expenses or standard mileage, not both.  Nash v. Commissioner, 60

[*46] T.C. 503, 520 (1973); accord Larson v. Commissioner, T.C. Memo. 2008-187, 96 T.C.M. (CCH) 73, 77 (2008). If the taxpayer elects the actual expense method, he must substantiate his business use percentage for the vehicle. Larson v. Commissioner, 96 T.C.M. (CCH) at 77; sec. 1.274-5T(d)(2), Temporary Income Tax Regs., 50 Fed. Reg. 46025 (Nov. 6, 1985).

During the examination of their tax returns petitioners initially sought to substantiate their claimed car and truck expense deductions using the actual expense method. On the basis of the evidence they provided, respondent, as to some claimed expenses, accepted petitioners' records as meeting the section 274(d) requirements and allowed deductions of $10,055 for 2008 and $14,544 for 2009. Petitioners subsequently provided mileage logs for certain vehicles in an effort to substantiate larger amounts of expenses, but RA Franks did not consider the logs.

If petitioners were able to substantiate greater car and truck expenses using the standard mileage method, we could possibly allow them the larger deductions, depending on whether they were actually using four vehicles or five. But we need not resolve this issue here because the mileage logs are not credible. See Larson v. Commissioner, 96 T.C.M. (CCH) at 77 (allowing taxpayer to claim "the lesser of the mileage shown on his returns, the mileage used to calculate his deduction, or the mileage substantiated by his monthly mileage logs" (emphasis added)). See

**[*47]** also Rev. Proc. 2007-70, sec. 5.06(1), 2007-2 C.B. 1162, 1165, Rev. Proc. 2008-72, sec. 5.06(1), 2008-2 C.B. 1286, 1288, limiting the use of the standard mileage rate where more than four vehicles are being used at once as in, for example, fleet operations, and Garner v. Commissioner, T.C. Memo. 1981-542, 42 T.C.M. (CCH) 1181, 1185-1186 (1981).  The mileage logs, however, do not satisfy section 274(d) because they do not reliably establish the time, amount, and business purpose of each use of petitioners' vehicles.  See sec. 1.274-5(j)(2), Income Tax Regs.; sec. 1.274-5T(c)(2), Temporary Income Tax Regs., supra.

As an initial matter, it appears that petitioners did not create the mileage logs contemporaneously with the trips they purport to record.  For the 1995 Nissan Mr. Ocampo handwrote entries on computer-generated weekly and monthly calendar pages that had been printed on July 15, 2014.  It seems extremely unlikely that, more than six years after some of the dates in question, he could have reconstructed with any degree of accuracy the daily travels of each of petitioners' vehicles.  See sec. 1.274-5T(c)(1), Temporary Income Tax Regs., 50 Fed. Reg. 46016 (Nov. 6, 1985).

The logs are also inconsistent with petitioners' tax returns and other evidence in the record.  On their 2008 and 2009 Federal income tax returns petitioners reported on Schedule C, Part IV, "Multiple Auto Statement", using five

[*48] vehicles for Ocampo's Landscaping, only one of which they contend was also used for personal purposes. They produced mileage logs for only three vehicles for 2008 and for four vehicles for 2009 and provided no explanation for the discrepancy.[19] The totals in petitioners' mileage logs diverge widely from the mileage totals reported on their Federal income tax returns:[20]

| Mileage shown in logs | | | Mileage recorded on returns | | |
|---|---|---|---|---|---|
| Vehicle | 2008 | 2009 | Vehicle | 2008 | 2009 |
| 1997 Chevy 3500 | 10,875.8 | 10,963.5 | Vehicle 1 | 25,104 | 30,547 |

[19]Petitioners attributed all of their personal mileage for both years to the 5th vehicle but also indicated that it was also used for business mileage; thus, a mileage log for this vehicle regarding the claimed 3,052 and 3,057 business miles for the years 2008 and 2009, respectively, was also needed in order to deduct expenses with respect to this vehicle. See Renner v. Commissioner, T.C. Memo. 2015-102.

[20]Contrary to petitioners' assertion on brief, it appears that petitioners' tax return preparer did not compute their claimed car and truck expense deductions using the standard mileage method. Petitioners recorded on their tax returns total business mileage of 84,114 for 2008 and 89,574 for 2009. For 2008 the business standard mileage rate was initially set at 50.5 cents per mile, so if petitioners had elected the standard mileage method and used the 50.5 cent rate for the entire year, they would have computed their deduction as $42,478. See Rev. Proc. 2007-70, 2007-2 C.B. 1162, 1163-1164. However, that rate was changed effective July 1, 2008 to 58.5 cents per mile through the end of that year. See Announcement 2008-63, 2008-2 C.B. 114. For 2009 the business standard mileage rate was 55 cents per mile, so if petitioners had elected the standard mileage method, they would have computed their deduction as $49,266. See Rev. Proc. 2008-72, sec. 5.01, 2008-2 C.B. 1286, 1286, 1288. On their returns petitioners claimed car and truck expense deductions of only $32,106 for 2008 and $38,989 for 2009.

| [*49] 1997 Ford F250 | 11,380.0 | 11,749.0 | Vehicle 2 | 20,597 | 25,147 |
|---|---|---|---|---|---|
| 2006 Ford F250 | 55,107.5 | 28,580.2 | Vehicle 3 | 15,147 | 20,569 |
| 1995 Nissan | --- | 27,809.3 | Vehicle 4 | 20,214 | 10,254 |
| | | | Vehicle 5 | 3,052 | 3,057 |

The mileage dates and numbers recorded in the logs also do not square with the maintenance and purchase records petitioners provided to RA Franks during the audit. In the logs petitioners claim to have driven the 2006 Ford F250 83,687.7 business miles during 2008 and 2009, but a December 31, 2009, maintenance record for that truck reflects an odometer reading of only 75,115 miles. The 2009 log for the 2006 Ford F250 reports 28,580.2 business miles driven for the year, but given the odometer reading recorded on a maintenance record for August 14, 2008, petitioners could have driven that vehicle no more than 19,517 miles between August 14, 2008, and December 31, 2009. Petitioners' log for the 1997 Ford F250 begins on January 2, 2008, but Mr. Ocampo did not purchase that vehicle until February 16, 2008.

In sum, petitioners' mileage logs are not credible. Lacking reliable evidence of petitioners' business mileage, we will evaluate their allowable car and truck expense deductions under the actual expense method.

**[\*50]** At trial respondent introduced documents reflecting some operating expenses for petitioners' vehicles for 2008 and 2009. RA Franks testified that some of the expenses represented by these documents had already been allowed. Although the record is unclear as to which of these expenses, if any, were disallowed, we decline to allow any beyond what respondent has already conceded. First, petitioners have not credibly established the business use percentage for three of their five vehicles which the Court concludes were used for at least some personal trips.

Even if the Court were to accept their mileage logs, they have not provided the beginning and ending odometer readings for each year, from which nonbusiness mileage could be computed. Second, petitioners have offered no evidence of the particular business purpose of each documented expenditure. See Renner v. Commissioner, T.C. Memo. 2015-102. Because section 274(d) governs, the Court cannot apply the Cohan rule to estimate additional allowable amounts on the basis of the documents in respondent's or petitioners' exhibits. See Sanford v. Commissioner, 50 T.C. at 827-828.

- 51 -

[*51] We will, however, allow depreciation.[21]  Petitioners did not report depreciation on their Federal income tax returns for 2008 or 2009, but evidence in the record substantiates depreciation for both years with respect to two of the vehicles.  While their mileage logs were not credible a preponderance of the evidence indicates that these two vehicles were used exclusively for business purposes.  Petitioners purchased the 2006 Ford F250 for $25,380 on July 26, 2005.  Treating the vehicle as five-year property placed in service during 2005 and applying the half-year convention and the 200% declining balance method, see sec. 168(b)(1), (d)(1), (4)(A), (e)(3)(B)(i), petitioners are entitled to deduct depreciation of $2,924 for 2008 and $2,924 for 2009.  Petitioners purchased the 1997 Ford F250 for $4,200 on February 16, 2008.  Again treating the vehicle as five-year property placed in service during 2008 and applying the half-year convention and the 200% declining balance method, see sec. 168(b)(1), (d)(1), (4)(A), (e)(3)(B)(i),

_____

[21]Respondent objects that petitioners did not claim depreciation on their tax returns or plead it in their petition or any amendment thereto.  Petitioners did, however, claim deductions for car and truck expenses, and the parties litigated their entitlement to use the actual expense method or the standard mileage method.  Because we have concluded that petitioners are entitled to deductions only under the actual expense method, they may deduct depreciation under that method in addition to the expenses respondent has allowed.  See, e.g., Campana v. Commissioner, T.C. Memo. 1990-395, 60 T.C.M. (CCH) 289, 291 (1990) (noting that actual expense method includes depreciation); Gresen v. Commissioner, T.C. Memo. 1986-152, 51 T.C.M. (CCH) 860, 861 (1986) (same).

**[\*52]** petitioners are entitled to deduct depreciation of $840 for 2008 and $1,344 for 2009. In total, we will allow petitioners to deduct $3,764 of depreciation as additional car and truck expenses for 2008 and $4,268 for 2009.

## III. Accuracy-Related Penalty

For 2008 respondent determined an accuracy-related penalty under section 6662(a) and (b)(1), (2) and (3) on the "boilerplate" bases of negligence or disregard of rules and regulations, a substantial understatement of income tax, or a substantial valuation misstatement.[22] As a general rule, the Commissioner bears the burden of production and "must come forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty." Higbee v. Commissioner, 116 T.C. 438, 446 (2001); see also sec. 7491(c). Once the Commissioner has met this

---

[22]These represent alternative grounds for imposition of the penalty, as the accuracy-related penalties do not stack. See sec. 1.6662-2(c), Income Tax Regs.

Sec. 6662(a) and (b)(3) provides for the imposition of a 20% penalty on the portion of an underpayment of tax required to be shown on a return that is attributable to a substantial valuation misstatement. For returns filed after August 17, 2006, as is relevant here, a substantial valuation misstatement occurs when "the value of any property (or the adjusted basis of any property) claimed on any return of tax imposed by chapter 1 is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)". Sec. 6662(e)(1)(A). Unfortunately, the "boilerplate" notice of deficiency does not explain what property's value or adjusted basis was allegedly misstated. Respondent did not discuss this issue at trial and has not addressed it on brief. As the Court can find no independent basis for this penalty in the record, we deem this issue conceded by respondent and find petitioners not liable for the substantial valuation misstatement penalty.

**[\*53]** burden of production, the burden will shift to the taxpayers to prove an affirmative defense or that they are otherwise not liable for the penalty. See <u>Higbee v. Commissioner,</u> 116 T.C. at 446-447.

Section 6662(a) and (b)(1) and (2) provides for the imposition of a 20% penalty on the portion of an underpayment of tax attributable to negligence or disregard of rules and regulations or a substantial understatement of income tax. "'[N]egligence' includes any failure to make a reasonable attempt to comply with the provisions of * * * [the Internal Revenue Code]". Sec. 6662(c). It constitutes "'a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'" <u>Freytag v. Commissioner</u>, 89 T.C. 849, 887 (1987) (quoting <u>Marcello v. Commissioner</u>, 380 F.2d 499, 506 (5th Cir. 1967), <u>aff'g</u> 43 T.C. 168 (1964) <u>and</u> T.C. Memo. 1964-299), <u>aff'd</u>, 904 F.2d 1011 (5th Cir. 1990), <u>aff'd</u>, 501 U.S. 868 (1991). "'Negligence' also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly." Sec. 1.6662-3(b)(1), Income Tax Regs. Disregard of rules and regulations "includes any careless, reckless or intentional disregard" of the Code, regulations, or certain IRS administrative guidance. <u>Id.</u> subpara. (2). A substantial understatement of income tax as to an individual taxpayer is generally an

[*54] understatement that exceeds the greater of $5,000 or 10% of the tax required to be shown on the return.  Sec. 6662(d)(1)(A).

Commencing with the negligence penalty, petitioners underreported their income and were unable to substantiate all of their business deductions.  Mr. Ocampo effectively acknowledged that respondent's determination of unreported income was in part attributable to his cashing checks at the Market and then dealing in cash without proper recordkeeping.  Although petitioners succeeded in demonstrating that some of their unreported deposits for 2008 were not taxable income, Mr. Ocampo had no explanation for other unreported deposits.  Moreover, petitioners failed to substantiate or even coherently explain their claimed business interest expenses, and the mileage logs they provided to substantiate their claimed car and truck expenses lacked credibility.  We think that a reasonable, prudent taxpayer would have had some explanation for the additional unreported deposits, and in any event, petitioners' failure to maintain adequate books and records to substantiate their expenses constitutes negligence for purposes of section 6662(a).  See sec. 1.6662-3(b)(1), Income Tax Regs.

Whether a substantial understatement exists, and if so, in what amount, will depend upon the recalculation of petitioners' 2008 tax liability in the light of the stipulation of settled issues and the holdings reached in this opinion.  We leave

**[*55]** these calculations to the parties under Rule 155. To the extent a substantial understatement within the meaning of section 6662(d)(1)(A) exists with respect to the tax stated on the 2008 return, and in any event on the basis of negligence, petitioners will be liable for the 20% penalty under section 6662(a) unless they can establish an affirmative defense.

A section 6662 penalty generally will not apply to any portion of an underpayment resulting from positions taken on the taxpayer's return for which the taxpayer had reasonable cause, and with respect to which the taxpayer acted in good faith. See sec. 6664(c). We determine "whether a taxpayer acted with reasonable cause and in good faith * * * on a case-by-case basis, taking into account all pertinent facts and circumstances." Sec. 1.6664-4(b)(1), Income Tax Regs. Reliance on professional advice will absolve the taxpayer if "such reliance was reasonable and the taxpayer acted in good faith." Id. Where a taxpayer claims reliance on professional advice, section 6664(c) will apply if "the taxpayer meets each requirement of the following three-prong test: (1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the

[*56] taxpayer actually relied in good faith on the adviser's judgment."[23]

Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

In challenging the accuracy-related penalty, petitioners point out that Benjamin Katz prepared their tax returns. Insisting that they had no reason to doubt his professionalism, they plead that they should not be held liable for his errors. Petitioners have not satisfied the Neonatology test with respect to Mr. Katz.

The record discloses nothing concerning Mr. Katz's qualifications. His signature block on petitioners' Federal income tax returns indicates only that he belonged to a firm called "Tax Professionals" with an office in Los Angeles. Jacques Behar, an enrolled agent who represented petitioners at the time of trial, testified that Mr. Katz, who passed away in March 2012, had been a friend and that Mr. Katz had allowed Mr. Behar to use his office when Mr. Behar visited Los Angeles. He said nothing of Mr. Katz's credentials or expertise, and petitioners other witnesses offered no further information.

---

[23]Petitioners also allude to reliance on Patrick McGinnis, the attorney who assisted them during the audit. Because they retained Mr. McGinnis only once their returns were under examination and do not contend that they relied on him in taking the tax positions at issue, their claimed reliance upon his advice is immaterial for sec. 6664(c) purposes.

[*57] Further, Mr. Ocampo did not establish what information he and Ms. Padilla provided to Mr. Katz, and petitioners offered no other evidence on this point. Indeed, they assert that they never provided Mr. Katz with information concerning the vehicles used in Ocampo's Landscaping and that he simply made up the number of vehicles reported on their returns without their knowledge. The record is silent as to what petitioners communicated to Mr. Katz concerning their Schedule C gross receipts, interest expenses, and car and truck expenses.

The regulations under section 6664(c) emphasize that "[g]enerally, the most important factor" in determining whether a taxpayer acted with reasonable cause and good faith "is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." Sec. 1.6664-4(b)(1), Income Tax Regs. In that regard, we have stated that "blind reliance on a professional does not establish reasonable cause." Estate of Goldman v. Commissioner, T.C. Memo. 1996-29, 71 T.C.M. (CCH) 1896, 1903 (1996). Together with petitioners' assertion that Mr. Katz fabricated the number of vehicle claimed on their tax returns, Mr. Ocampo's lack of knowledge, exhibited at trial, concerning where and in what amounts interest expense had been reported on his tax returns, strongly suggests that petitioners did not exercise due care in reviewing their tax returns before signing them. Although we do not propose that petitioners should have second-guessed Mr. Katz's work,

**[\*58]** <u>see</u> <u>United States v. Boyle</u>, 469 U.S. 241, 251 (1985), we do think that, had they reviewed the 2008 return before signing it, they would have noticed the number of vehicles reported and the interest expense claimed.

For the foregoing reasons, we conclude that petitioners have not established an affirmative defense to, and are liable for, the accuracy-related penalty for 2008. The Court has considered all of the parties' contentions, arguments, requests, and statements. To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.

**[*59]**                                    APPENDIX A

| UCU Acct 83734 - 2008 Deposits (from Ex. 12-J) | | | | | | |
|---|---|---|---|---|---|---|
| Deposit Date | Check No. | Check Date | Category | Payor | Amount | Explanatory Note |
| | | | | | | |
| | | | **NONTAXABLE DEPOSITS** | | | |
| | | | | | | |
| 2/5/08 | | | Transfer | Line of Credit | $92.48 | |
| 3/14/08 | | | Transfer | Line of Credit | $451.94 | |
| 3/25/08 | 1629 | 3/21/08 | Reimbursement | La Casa Investments | $2,874.04 | |
| 5/14/08 | | | Purchase Return | Target credit adjustment | $16.23 | |
| 5/14/08 | | | Purchase Return | DSW credit adjustment | $33.50 | |
| 6/5/08 | | | Purchase Return | DSW credit adjustment | $16.24 | |
| 7/9/08 | 1008 | 7/9/08 | Transfer | Ocampo's Trans | $3,000.00 | |
| 8/7/08 | | | ATM Withdrawal Reversal | Cardtronics refund | $80.00 | |
| 8/14/08 | 1014 | 8/13/08 | Transfer | Ocampo's Trans to W | $2,000.00 | Deposited at same time as $472 amount listed as unknown; not identified in BDA as a nontaxable transfer; canceled check omitted from UCU account records, but included in WAMU account records (Ex. 3-J at 63) |
| 8/28/08 | | | Transfer | Line of Credit | $246.13 | |
| 8/29/08 | 1019 | 8/28/08 | Transfer | Ocampo's Trans to W | $3,000.00 | Payor misidentified in BDA because UCU included a canceled check from another person's account (Ex. 12-J at 13); correct canceled check in WAMU account records (Ex. 3-J at 96) |
| 9/9/08 | 1021 | 9/9/08 | Transfer | Ocampo's | $2,000.00 | |

[*60]

| | | | | | | |
|---|---|---|---|---|---|---|
| 9/17/08 | | | Purchase Return | Macy's West credit adjustment | $63.87 | |
| 9/19/08 | 1030 | 9/19/08 | Transfer | Ocampo's Trans to W | $1,000.00 | Not identified in BDA as a nontaxable transfer; canceled check omitted from UCU account records but included in WAMU account records (Ex. 3-J at 84) |
| 9/22/08 | | | Transfer | Line of Credit | $48.47 | |
| 9/26/08 | 1031 | 9/26/08 | Transfer | Ocampo's | $2,000.00 | Not identified in BDA as a nontaxable transfer; canceled check omitted from UCU account records but included in WAMU account records (Ex. 3-J at 112) |
| 10/14/08 | 1036 | 10/14/08 | Transfer | Ocampo's | $2,500.00 | Deposited at same time as $186 amount listed as unknown; not identified in BDA as a nontaxable transfer; canceled check omitted from UCU account records but included in WAMU account records (Ex. 3-J at 110) |
| 10/21/08 | 1038 | 10/21/08 | Transfer | Ocampo's | $2,000.00 | Deposited at same time as $148 amount listed as unknown; not identified in BDA as a nontaxable transfer; canceled check omitted from UCU account records but included in WAMU account records (Ex. 3-J at 107) |
| 10/23/08 | | | Purchase Return | Gymboree credit adjustment | $55.38 | |
| 10/27/08 | | | Purchase Return | Party City credit adjustment | $4.33 | |

[*61]

| Date | Check | Date2 | Type | Source | Amount | Notes |
|---|---|---|---|---|---|---|
| 11/4/08 | | | Transfer | Line of Credit | $95.33 | |
| 11/5/08 | 1043 | 11/4/08 | Transfer | Ocampo's | $500.00 | |
| 11/7/08 | 29-488661 | 10/28/08 | Refund - Tax | California FTB | $432.00 | |
| 11/7/08 | 230951426097 | 10/31/08 | Refund - Tax | US Treasury | $2,232.00 | |
| 11/19/08 | 1049 | 11/18/08 | Transfer | Ocampo's | $1,400.00 | |
| 12/4/08 | | | Purchase Return | TJ Maxx credit adjustment | $38.91 | |
| 12/10/08 | 1055 | 12/8/08 | Transfer | Ocampo's | $3,700.00 | Not identified in BDA as a nontaxable transfer; canceled check omitted from UCU account records but included in WAMU account records (Ex. 3-J at 164) |
| 12/16/08 | | | Purchase Return | Target credit adjustment | $13.20 | |
| 12/18/08 | | | Purchase Return | Macy's West credit adjustment | $20.24 | |
| 12/22/08 | 1059 | 12/20/08 | Transfer | Ocampo's | $2,000.00 | |
| 12/31/08 | 1061 | 12/31/08 | Transfer | Ocampo's | $2,000.00 | |
| TOTAL NONTAXABLE DEPOSITS: | | | | | $33,914.29 | |

**PRESUMPTIVELY TAXABLE DEPOSITS**

| Date | | | Type | Source | Amount | |
|---|---|---|---|---|---|---|
| 1/31/08 | | | Interest | UCU | $2.60 | |
| 2/29/08 | | | Interest | UCU | $3.42 | |
| 3/31/08 | | | Interest | UCU | $1.49 | |
| 4/30/08 | | | Interest | UCU | $3.51 | |
| 5/30/08 | | | Interest | UCU | $0.93 | |
| 6/30/08 | | | Interest | UCU | $0.93 | |
| 7/31/08 | | | Interest | UCU | $0.65 | |
| 8/29/08 | | | Interest | UCU | $0.75 | |
| 9/30/08 | | | Interest | UCU | $0.68 | |
| 10/31/08 | | | Interest | UCU | $1.30 | |
| 11/28/08 | | | Interest | UCU | $0.70 | |
| 12/31/08 | | | Interest | UCU | $0.49 | |
| | | | Total Interest: | | $17.45 | |

[*62]

| | | | | | | |
|---|---|---|---|---|---|---|
| 1/9/08 | | | Wages | UCLA | $1,245.51 | |
| 1/23/08 | | | Wages | UCLA | $898.34 | |
| 2/6/08 | | | Wages | UCLA | $1,083.56 | |
| 2/20/08 | | | Wages | UCLA | $995.86 | |
| 3/5/08 | | | Wages | UCLA | $1,201.27 | |
| 3/19/08 | | | Wages | UCLA | $944.63 | |
| 4/2/08 | | | Wages | UCLA | $1,052.60 | |
| 4/16/08 | | | Wages | UCLA | $944.63 | |
| 4/30/08 | | | Wages | UCLA | $1,065.00 | |
| 5/14/08 | | | Wages | UCLA | $947.27 | |
| 5/28/08 | | | Wages | UCLA | $1,052.61 | |
| 6/11/08 | | | Wages | UCLA | $1,037.41 | |
| 6/25/08 | | | Wages | UCLA | $971.06 | |
| 7/9/08 | | | Wages | UCLA | $1,065.01 | |
| 7/23/08 | | | Wages | UCLA | $1,202.13 | |
| 8/6/08 | | | Wages | UCLA | $1,292.20 | |
| 8/20/08 | | | Wages | UCLA | $944.62 | |
| 9/3/08 | | | Wages | UCLA | $1,052.61 | |
| 9/17/08 | | | Wages | UCLA | $1,045.40 | |
| 10/1/08 | | | Wages | UCLA | $1,316.86 | |
| 10/15/08 | | | Wages | UCLA | $1,259.01 | |
| 10/29/08 | | | Wages | UCLA | $1,662.08 | |
| 11/12/08 | | | Wages | UCLA | $949.26 | |
| 11/26/08 | | | Wages | UCLA | $1,056.94 | |
| 12/10/08 | | | Wages | UCLA | $1,153.60 | |
| 12/23/08 | | | Wages | UCLA | $935.42 | |
| | | | Total Wages: | | $28,374.89 | |
| | | | | | | |
| 1/3/08 | | | Cash | | $5,000.00 | |
| 1/11/08 | | | Cash | | $5,000.00 | |
| 2/6/08 | | | Cash | | $2,800.00 | |
| 3/14/08 | | | Cash | | $5,000.00 | |
| 4/9/08 | | | Cash | | $4,000.00 | |
| 5/22/08 | | | Cash | | $2,400.00 | |
| 5/28/08 | | | Cash | | $1,700.00 | |
| 6/11/08 | | | Cash | | $3,000.00 | |
| 8/20/08 | | | Cash | | $1,200.00 | |
| | | | Total Cash: | | $30,100.00 | |

- 63 -

**[*63]**

| | | | | | | |
|---|---|---|---|---|---|---|
| 4/11/08 | | | Unknown | | $7.68 | |
| 8/4/08 | | | Unknown | | $530.05 | |
| 8/14/08 | | | Unknown | | $472.00 | Total deposit of $2,472 less $2,000 transfer, check no. 1014. |
| 10/14/08 | | | Unknown | | $186.00 | Total deposit of $2,686 less $2,500 transfer, check no. 1036. |
| 10/21/08 | | | Unknown | | $148.00 | Total deposit of $2,148 less $2,000 transfer, check no. 1038. |
| | | | Total Unknown: | | $1,343.73 | |
| | | | | | | |
| 2/8/08 | 2254 | 2/7/08 | Schedule C | Jill Gordon | $7,049.00 | |
| 4/9/08 | 147 | 4/4/08 | Schedule C | Peter Skewes Cox | $2,000.00 | |
| 4/14/08 | 277 | 4/14/08 | Schedule C | Vanessa Biddle | $9,000.00 | |
| 6/18/08 | 4601 | 6/15/08 | Schedule C | Burt Berman | $3,000.00 | |
| | | | Total Schedule C: | | $21,049.00 | |
| | | | | | | |
| TOTAL PRESUMPTIVELY TAXABLE DEPOSITS: | | | | | $80,885.07 | |
| | | | | | | |
| TOTAL DEPOSITS (NONTAXABLE & TAXABLE): | | | | | $114,799.36 | |

- 64 -

[*64]                    APPENDIX B

| UCU Acct 83734 - 2009 Deposits (from Ex. 13-J) | | | | | | |
|---|---|---|---|---|---|---|
| Deposit Date | Check No. | Check Date | Category | Payor | Amount | Explanatory Note |
| | | | | | | |
| | | | NONTAXABLE DEPOSITS | | | |
| | | | | | | |
| 1/13/09 | 1067 | 1/12/09 | Transfer | Ocampo's | $1,500.00 | Canceled check omitted from UCU account records but included in WAMU account records (Ex. 4-J at 35) |
| 1/27/09 | 1076 | 1/24/09 | Transfer | Ocampo's | $1,500.00 | |
| 2/13/09 | 1080 | 2/13/09 | Transfer | Ocampo's | $3,800.00 | |
| 3/9/09 | 1093 | 3/9/09 | Transfer | Ocampo's | $2,600.00 | |
| 4/10/09 | 1112 | 4/10/09 | Transfer | Ocampo's | $2,000.00 | |
| 4/13/09 | | | Transfer | Line of Credit | $240.11 | |
| 5/5/09 | | | Fee Reversal | UCU | $20.00 | |
| 5/5/09 | 1114 | 5/5/09 | Transfer | Ocampo's | $2,000.00 | Deposited at same time as $600 amount listed as unknown. |
| 5/5/09 | | | Transfer | Line of Credit | $48.01 | |
| 5/14/09 | 1120 | 5/14/09 | Transfer | Ocampo's | $3,000.00 | |
| 6/22/09 | 1140 | 6/20/09 | Transfer | Ocampo's | $1,500.00 | |
| 7/9/09 | 1154 | 7/9/09 | Transfer | Ocampo's | $2,000.00 | |
| 7/29/09 | | | Transfer | Line of Credit | $13.05 | |
| 8/6/09 | 1163 | 8/6/09 | Transfer | Ocampo's | $3,000.00 | |
| 8/11/09 | | | Purchase Return | Target | $41.68 | |
| 9/4/09 | 1195 | 9/4/09 | Transfer | Ocampo's | $3,000.00 | |
| 9/17/09 | | | Purchase Return | Office Depot | $35.72 | |
| 10/9/09 | 1236 | 10/7/09 | Transfer | Ocampo's | $1,800.00 | |
| 10/23/09 | 1006 | 10/21/09 | Return of Capital | Ocampo's, Inc. | $1,600.00 | |
| 11/18/09 | 1029 | 11/17/09 | Return of Capital | Ocampo's, Inc. | $2,200.00 | |
| 11/23/09 | | | Transfer | Line of Credit | $21.29 | |
| 12/7/09 | | | Transfer | Line of Credit | $218.79 | |
| 12/15/09 | 1049 | 12/14/09 | Return of Capital | Ocampo's, Inc. | $4,000.00 | |
| 12/22/09 | | | Purchase Return | Petco | $19.74 | |
| | | | | | | |
| TOTAL NONTAXABLE DEPOSITS: | | | | | $36,158.39 | |

[*65]

| PRESUMPTIVELY TAXABLE DEPOSITS | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| 1/30/09 | | | Interest | UCU | $0.47 | |
| 2/27/09 | | | Interest | UCU | $0.26 | |
| 3/31/09 | | | Interest | UCU | $0.13 | |
| 4/30/09 | | | Interest | UCU | $0.08 | |
| 5/29/09 | | | Interest | UCU | $0.45 | |
| 6/30/09 | | | Interest | UCU | $0.31 | |
| 7/31/09 | | | Interest | UCU | $0.25 | |
| 8/31/09 | | | Interest | UCU | $0.27 | |
| 9/30/09 | | | Interest | UCU | $0.18 | |
| 10/30/09 | | | Interest | UCU | $0.13 | |
| 11/30/09 | | | Interest | UCU | $0.05 | |
| 12/31/09 | | | Interest | UCU | $0.09 | |
| | | | Total Interest: | | $2.67 | |
| | | | | | | |
| 1/7/09 | | | Wages | UCLA | $1,234.87 | |
| 1/21/09 | | | Wages | UCLA | $919.21 | |
| 2/4/09 | | | Wages | UCLA | $1,142.89 | |
| 2/18/09 | | | Wages | UCLA | $1,232.11 | |
| 3/4/09 | | | Wages | UCLA | $1,997.92 | |
| 3/18/09 | | | Wages | UCLA | $1,003.75 | |
| 4/1/09 | | | Wages | UCLA | $1,439.68 | |
| 4/15/09 | | | Wages | UCLA | $1,061.00 | |
| 4/29/09 | | | Wages | UCLA | $1,166.26 | |
| 5/13/09 | | | Wages | UCLA | $1,038.82 | |
| 5/27/09 | | | Wages | UCLA | $1,148.68 | |
| 6/10/09 | | | Wages | UCLA | $1,424.51 | |
| 6/24/09 | | | Wages | UCLA | $1,112.87 | |
| 7/8/09 | | | Wages | UCLA | $1,182.08 | |
| 7/22/09 | | | Wages | UCLA | $919.50 | |
| 8/5/09 | | | Wages | UCLA | $1,177.60 | |
| 8/19/09 | | | Wages | UCLA | $1,157.70 | |
| 9/2/09 | | | Wages | UCLA | $1,179.61 | |
| 9/16/09 | | | Wages | UCLA | $1,062.28 | |
| 9/30/09 | | | Wages | UCLA | $1,250.52 | |
| 10/14/09 | | | Wages | UCLA | $1,058.64 | |
| 10/28/09 | | | Wages | UCLA | $1,176.73 | |
| 11/10/09 | | | Wages | UCLA | $1,227.94 | |
| 11/25/09 | | | Wages | UCLA | $1,023.67 | |
| 12/9/09 | | | Wages | UCLA | $1,231.92 | |

- 66 -

[*66]

| | | | | | | |
|---|---|---|---|---|---|---|
| 12/23/09 | | | Wages | UCLA | $1,040.99 | |
| | | | Total Wages: | | $30,611.75 | |
| | | | | | | |
| 3/27/09 | | | Unknown | | $50.00 | |
| 5/5/09 | | | Unknown | | $600.00 | |
| 6/10/09 | | | Unknown | | $1,600.00 | |
| 7/31/09 | | | Unknown | | $72.87 | |
| 12/23/09 | | | Unknown | | $63.94 | |
| | | | Total Unknown: | | $2,386.81 | |
| | | | | | | |
| TOTAL PRESUMPTIVELY TAXABLE DEPOSITS: | | | | | $33,001.23 | |
| | | | | | | |
| TOTAL DEPOSITS (NONTAXABLE & TAXABLE): | | | | | $69,159.62 | |